IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,614

STATE OF KANSAS,
*Appellee*,

v.

ANTWON D. BANKS, SR.,
*Appellant.*

SYLLABUS BY THE COURT

1.

A conviction of even the gravest offense can be based entirely on circumstantial evidence. In a prosecution for premeditated first-degree murder, the premeditation element is most often proved by circumstantial evidence. A jury is permitted to infer premeditation from the established circumstances of the case, provided that the inference is a reasonable one.

2.

Convictions based entirely upon circumstantial evidence can present a special challenge to appellate courts because the circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances. Where the State relies upon inference stacking, *i.e.*, where the State asks the jury to make a presumption based upon other presumptions, it has not carried its burden to present sufficient evidence to sustain a criminal conviction.

1

3.

Impermissible inference stacking is not present where different circumstances are used to support separate inferences or where multiple pieces of circumstantial evidence separately support a single inference.

4.

In a criminal prosecution, prosecutors are allowed to craft arguments that include reasonable inferences to be drawn from circumstantial evidence, so long as the circumstances have themselves been proved, rather than having been presumed from other circumstances.

5.

A trial court violates a criminal defendant's fundamental right to a fair trial if the court excludes relevant, admissible, and noncumulative evidence that is an integral part of the theory of defense. But the right to present a defense is subject to the established rules of evidence and procedure.

6.

The proponent of evidence is required to lay a foundation for its admissibility. The foundation for admitting a writing requires that it meet the authentication requirements of K.S.A. 60-464.

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed July 21, 2017. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

2

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: Antwon D. Banks, Sr., directly appeals his jury trial conviction for the premeditated first-degree murder of Daniel Flores. He contends that the State failed to present sufficient evidence to support the conviction, that the prosecutor committed reversible error during closing argument, and that the district court violated Banks' right to present a defense by excluding certain photographs. We affirm the conviction.

FACTUAL AND PROCEDURAL OVERVIEW

The victim, Flores, worked at Steckline Communications (Steckline), which operated a radio station in Wichita, where Banks' former girlfriend, Lisa Bryce, was the office and human resources manager. Flores' deadly encounter with Banks appears to have been an ill-fated happenstance.

Banks and Bryce had dated sporadically for a little over a year before Banks moved in with Bryce in December 2013. Banks' suspicions of infidelity soured the relationship, and by February 2014, Bryce told Banks to move out. Nevertheless, Banks continued to text or call Bryce, sometimes several times a day. He made multiple contacts with Bryce on Sunday, February 9, 2014, the date of the murder.

At some point on February 9, 2014, Banks hatched a plan to break into the Steckline building and "mess with" Bryce's computer. Banks shared the idea with his friend, Dartonja Looney, who advised Banks to disturb multiple offices inside the building to avoid the appearance that Bryce was the targeted victim. About 8 p.m. that

3

evening, Banks was driven to a parking lot directly across the street from the Steckline building by Camishia Ford, another woman he was dating at the time, on the pretense that he was going to retrieve his stolen wallet.

Surveillance cameras revealed that Banks sat in Ford's vehicle for 14 minutes before exiting and crossing the street to the Steckline building. He returned to Ford's car 41 minutes later. Ford said that Banks was breathing heavily when he returned to the car carrying an object wrapped in a jacket or hoodie, saying they needed to leave. Banks related that he had been in the basement of the Steckline building and had heard two men fighting upstairs. He said that he had bumped into a fire extinguisher which he said was the object in his possession, albeit Ford could not verify the identity of the object.

The next morning, Monday, February 10, 2014, about 7 a.m., the first employee to arrive at the station, Blake Cripps, discovered that Bryce's office and the office of station owner, Greg Steckline, had been disturbed. Cripps texted a picture of the damage to Bryce, who said she would arrive soon to report the incident.

At approximately 7:45 a.m., Flores' immediate supervisor, Phillip Padilla, arrived and checked the basement area. Padilla had difficulty opening the door because it was blocked by Flores' body. Upon discovering the body, Padilla called 911 at 7:58 a.m.

On arrival, the investigators found Flores lying flat on his face, with his arms underneath his body, just inside the basement door. There was blood spatter on several walls, with a large area of blood on the wall close to the floor, near Flores' head. Five of Flores' teeth were found nearby, two of which were under the body. Flores was pronounced dead at the scene.

4

Investigators also discovered that one of the fire extinguishers was missing, a wall had damage that appeared consistent with the bottom of a fire extinguisher, and a service tag from a fire extinguisher was on the floor near Flores. The missing fire extinguisher was never found.

Investigators found a critical clue on the basement walls. Someone had written violent, racist, and misogynistic messages directed towards Bryce and had drawn a stick person in a noose with the words "Hang nigga!" Bryce told police that the writing did not look like Banks' handwriting but that the content of the messages, the poor spelling, and the use of the word "nigga" all pointed to Banks as the author.

Flores' autopsy revealed that he had been struck in the head four times—twice in the front and twice in the back—and that five teeth had been knocked out. Flores did not have any defensive wounds. The coroner could definitively state that the cause of death was blunt force trauma to the head, albeit the coroner could not establish what instrument had been used to cause the injuries or the exact time of death.

DNA testing did not produce results that definitively pointed to Banks as the killer.

Ford was interviewed twice by police. After learning that a murder had occurred in the Steckline building, she was more forthcoming during the second interview. Ford related the information about her conversations with Banks and admitted that she had driven him to the Steckline building.

Banks was arrested February 12, 2014, after officers saw Banks driving near his apartment. Upon making a traffic stop and approaching the vehicle, the arresting officer discovered that Banks had stabbed himself in the stomach.

While in jail, Banks talked to another inmate, Cortez Williams, who later contacted police. According to Williams, Banks initially said that he had gone to the Steckline building to retrieve tax paperwork, but when he heard noises in the basement, he went down to investigate and tripped over a body in the basement. But Williams testified that Banks later told him something to the effect that he "didn't mean to" or "didn't mean for it to happen like that." Williams also said that Banks had related that he used a fire extinguisher, which he later discarded in a Wal-Mart dumpster.

While in custody, Banks indicated that he wanted to talk with the police. During the ensuing police interview, Banks said that he was at the Steckline building to retrieve insurance papers and that once inside, he heard the sounds of arguing upstairs, prompting him to leave through the basement. But he explained that, because he had seen the derogatory writing on the wall referencing Bryce and her daughter and knew it would look bad for Banks, he returned to the station later to remove the writing.

Banks' trial began March 30, 2015, and on April 7, 2015, the jury found Banks guilty of premeditated first-degree murder. The district court sentenced Banks to life in prison without the possibility of parole for 25 years. He timely appeals, raising the issues recited above.

## SUFFICIENCY OF THE EVIDENCE

Due process requires the State to prove every element of the charged crime. *In re Winship*, 397 U.S. 358, 361-64, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. Gould*, 271 Kan. 394, 411, 23 P.3d 801 (2001). Here, the charged crime was premeditated first-degree murder and, pursuant to the statutory definition of that crime in K.S.A. 2013

6

Supp. 21-5402(a)(1), the State had to prove that Banks killed Flores, that Banks intended to kill Flores, and that Banks premeditated the killing of Flores.

Banks contends that the State's evidence was insufficient to prove the premeditation element because it was based upon impermissible inference stacking. The State persuasively counters that there was direct evidence of multiple circumstances, each of which could reasonably support an inference of premeditation.

*Standard of Review*

When the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the State. A conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). In determining whether there is sufficient evidence to support a conviction, an appellate court generally will not reweigh the evidence or reassess witness credibility. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

*Analysis*

An oft-recited, longstanding maxim provides that a conviction of even the gravest offense can be based entirely on circumstantial evidence. See, *e.g*., *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016); *State v. Richardson*, 289 Kan. 118, 127, 209 P.3d 696 (2009); *State v. Hunter*, 50 Kan. 302, 304, 32 P. 37 (1893) ("the corpus delicti of the gravest offenses may be established by circumstantial evidence"). A verdict may be sustained if the circumstantial evidence supporting it permits the factfinder to draw a reasonable inference regarding the fact(s) in issue. This court has even said that

7

circumstantial evidence need not exclude every other reasonable conclusion in order to be sufficient to support a conviction. *Logsdon*, 304 Kan. at 25.

The fact in issue here—premeditation—is most often proved by circumstantial evidence. *State v. Scaife*, 286 Kan. 614, 620, 186 P.3d 755 (2008). We permit the factfinder to infer premeditation from the established circumstances of the case, provided that the inference is a reasonable one. *Scaife*, 286 Kan. at 617 (citing *State v. Morton,* 283 Kan. 464, 475, 153 P.3d 532 [2007]).

On the other hand, convictions based entirely upon circumstantial evidence "'can present a special challenge to the appellate court' because '"the circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances."' *State v. Williams*, 229 Kan. 646, 648-49, 630 P.2d 694 (1981) (quoting 1 Wharton's Criminal Evidence § 91, pp. 150-51 [13th ed. 1972])." *State v. Richardson*, 289 Kan. 118, 127, 209 P.3d 696 (2009). Where the State relies on such inference stacking, *i.e.*, where the State asks the jury to make a presumption based upon other presumptions, it has not carried its burden to present sufficient evidence. *Richardson*, 289 Kan. at 130.

Banks contends that the State asked the jury in this case to stack inferences in order to find the requisite premeditation element. He appears to equate inference stacking with the State's reliance on multiple circumstances. But the prosecution is not required to use the same circumstance for each and every element of the crime or for every fact it wants the jury to infer. For instance, one circumstance may be intended to imply that Banks had a motive for killing Flores, while another circumstance might be proved to establish that the killing was intentional, and yet another circumstance could be relied upon for the premeditation element. That scenario does not fit the proscribed inference-stacking paradigm.

8

Likewise, the State is not limited to just one circumstance for each element. Indeed, we have noted that there are a number of factors that can point to the existence of premeditation, more than one of which might well be present in any given case, to-wit: "'(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless.'" *State v. Oliver,* 280 Kan. 681, 704, 124 P.3d 493 (2005), *cert. denied* 547 U.S. 1183 (2006). If the State establishes more than one of those circumstances, it is not stacking inferences; it is corroborating inferences.

Here, the prosecutor relied, in part, on the fifth factor, *i.e.*, Banks dealt lethal blows after Flores was felled and rendered helpless. The way in which Flores' body was discovered provided the direct evidence from which to infer that he was felled and rendered helpless. The body was just inside the basement door, face down with Flores' hands and two of his knocked-out teeth underneath his body. There were no defensive wounds. The inference that Banks delivered additional blows after Flores was felled was supported by the direct evidence of blood spatter low on the wall adjacent to the body. Likewise, the prosecutor argued that the head wounds appeared to be shaped differently, as if delivered from different angles. Moreover, the blood on the floor surrounding the body supported the notion that Flores lived for a time after being felled.

Further, there were other circumstances supporting an inference of premeditation. For instance, the autopsy provided direct evidence that Flores had suffered four blows to the head, two in front and two in back. We previously recognized that multiple blows could be evidence of premeditation. See *State v. Warledo*, 286 Kan. 927, 950, 190 P.3d 937 (2008) (multiple blows show defendant had an opportunity to reflect on actions and

9

form requisite premeditation). Moreover, the evidence that Flores had not put up a fight could support an inference of a lack of provocation.

Again, it is permissible for the State to rely on multiple circumstances to support an inference of premeditation, so long as each circumstance has been proved, rather than presumed from another circumstance. *Cf. State v. Netherland*, 305 Kan. 167, 179, 379 P.3d 1117 (2016) (multiple pieces of circumstantial evidence supporting a single inference does not constitute inference stacking). In other words, while it is impermissible for a case to rely upon the theory that presumption A leads to presumption B leads to presumption C leads to fact D, it is perfectly proper for the State's case to be grounded upon a theory that presumption A, presumption B, and presumption C all separately point to fact D.

In sum, we hold that the State provided sufficient evidence from which a rational jury could find, beyond a reasonable doubt, that Banks premeditated Flores' murder.

PROSECUTORIAL ERROR IN CLOSING ARGUMENT

Banks repurposes his inference-stacking theory as a claim of prosecutorial error, arguing that the prosecutor encouraged the jury to decide the case based on unreasonable inferences, rather than on either direct or circumstantial evidence. He contends that the prosecutor's closing arguments were outside the wide latitude afforded prosecutors and constituted plain error.

*Standard of Review*

This court recently revamped the two-step framework for considering claims previously referred to as prosecutorial misconduct but now termed prosecutorial error.

10

See *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016). Appellate courts must first determine whether prosecutorial error has occurred by deciding whether the prosecutor's actions fall outside the wide latitude afforded prosecutors to conduct the State's case to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the court moves to the prejudice step and applies the traditional constitutional harmlessness inquiry demanded by *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), *i.e.*, whether the State can show there is no reasonable possibility that the error affected the verdict. *Sherman*, 305 Kan. at 109.

*Analysis*

The determination of the first prong—whether the prosecutor's remarks are outside the wide latitude afforded prosecutors—is left unchanged by *Sherman*, 305 Kan. at 104 (citing *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 [2004]). Under this analysis, it is clearly improper for a prosecutor to state facts that are not in evidence. *State v. Ly*, 277 Kan. 386, 393, 85 P.3d 1200 (2004). But, on the other hand, prosecutors are allowed "'to craft arguments that include reasonable inferences to be drawn from the evidence.'" *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 (2010).

Banks contends that, because there were no eyewitnesses, the prosecutor filled in unknown facts with unreasonable inferences. For instance, Banks specifically complains of the following portion of the State's closing argument:

> "What you can decide for yourselves and what you can determine from this photograph tells a lot. . . . And what you can determine is that by that time that the blood went to the wall, by the time Daniel's head was bashed in with that fire extinguisher, he was already laying on the ground and he was down and he was likely out. And then the person killed him, the person who did it decided it's time for Daniel to die and they inflicted additional blows to the back of his head . . . .

11

. . . .

"The person who did this, ladies and gentlemen, beat Daniel after he was laying on the ground, likely out, likely incapacitated. He didn't have to kill him. They could have left him there, they could have gone, but they decided it was not going to happen. Daniel had to die for what he had seen, for what he had witnessed.

. . . .

"So the evidence, ladies and gentlemen, points you to this, Daniel is coming down the stairs, the perpetrator is in there writing on the wall, still writing on the wall, because the cap is still off of the Sharpie, the person is writing on the wall, Daniel comes down the stairs, opens the door and is met with bam, right in the mouth. Maybe the first one is the head, maybe the first one is the mouth, who knows. But what you know then is he goes down, he goes down and he bleeds and then the person strikes him twice more in the back of the head, killing him.

"Dr. Gorrill told you that's what caused his death, blunt force trauma to the head, multiple blunt force injuries, struck at least four times. Is there any question really that this is a premeditated murder? And as I said, this isn't what you might think of.

"We talked about in jury selection this is not what you might think of when you think of a premeditated murder, where somebody sets out and says I'm going to stalk them and I'm going to bind them and I'm going to kill them. This is not that. This is, by definition, a premeditated murder, someone who thought the matter over beforehand and decided Daniel Flores is going to die."

Our rejection of Banks' inference-stacking argument undermines his claim of prosecutorial error based on unreasonable inferences. As noted above, the State's claims were based on direct evidence of circumstances and the inferences a jury would be permitted to draw from that evidence. One might discern that the prosecutor came close

12

to scripting the crime for the jury in more detail than the evidence justified. Nevertheless, the relevant inferences asserted by the prosecutor were supported by the evidence and were reasonable. In short, the prosecutor's closing remarks did not constitute error.

EXCLUSION OF DEFENSE PHOTOGRAPHS

In his final issue, Banks contends that the district court violated his right to present a defense by excluding three photographs depicting handwritten notes that were found in Flores' car. That claim requires the recitation of additional facts.

During Banks' case-in-chief, defense counsel moved to introduce 16 exhibits that were photographs of the interior of Daniel Flores' car taken by a crime scene investigator (CSI) when the car was searched on February 11, 2014. The State objected to three of the exhibits based on foundation, hearsay, and relevance. Those challenged exhibits were Defense Exhibits A3, L, and M, which were each an 8 1/2 x 11 inch sheet of paper depicting two photographs. One of the photographs on Defendant's Exhibit A3 showed a piece of paper with the address "10607 West Maple Street #6 Wichita KS 67209" written on it, and the other depicted the trunk area of Flores' car, which was covered in loose papers, soda cans, and bottles. Defendant's Exhibit L contained one photograph of a piece of paper with the writing "Phone Numbers Cumulus," together with some numbers scribbled out and the numbers "914-908-3210" surrounded by a hand drawn box. The second photograph showed the initials "KMBZ" with the number "918" scribbled out and the numbers "913-576-7798." Below this was written the numbers "913-744-3780" and the name "Jack." On Defendant's Exhibit M, one photograph showed a piece of paper with two sets of numbers, "913-7" and "44-3977." The note in the second photograph contained the numbers "208-339-8113" scribbled out and the underlined name "coach Larry" with the underlined numbers, "721-3030."

13

In response to the district court's inquiry about the foundation for the writings, defense counsel responded that sufficient foundation had been laid when the CSI testified about taking the photographs. When asked if she intended to use the photographs "for some sort of handwriting comparison," defense counsel stated she intended to introduce the photos not for a scientific handwriting comparison, but so that the jury could compare the notes to the writing on the basement wall in the Steckline building.

The district court explained that, because the notes "could have been written by somebody else," the defense would have to establish the relevance of the photographs by identifying Flores as the author of the notes or directly connecting him to the notes in some manner. Defense counsel responded that she would have to call one of Flores' parents to lay the foundation to say it is his writing, but she continued to argue that further authentication was not required because the notes were found in Flores' car. After the district court sustained the State's objection to a lack of foundation, defense counsel asked if the State would still object to the exhibits if Banks could authenticate the writings through Flores' parents or someone else. The State responded that its objection would be withdrawn at that point.

Despite the fact that an authenticated writing authored by Flores in the form of a time sheet found on Bryce's desk was admitted into evidence and despite the fact that Flores' father testified on rebuttal, Banks made no effort during trial to authenticate the writings depicted in the photographs he had proffered.

Following trial, Banks raised the issue of the exhibits in a motion for new trial, arguing that the photographs were central to his theory of defense and their exclusion "required a change in the theory of defendant's case, such that he was prejudiced." At the motion hearing, the district court reiterated that the reason it did not allow the photographs was that "there wasn't anybody to identify whose handwriting that was." The

14

district court explained, "[I]n order for [the photographs] to be relevant, in order for it not to be misleading to the jury, we needed to have some tie-in as to who it was." Additionally, the district court pointed out that despite the ruling, the defense "still was free to argue that the victim, Daniel Flores, wrote the things on the wall himself." The district court denied Banks' motion for new trial.

On appeal, Banks continues to claim that the writings were critical to his defense and their exclusion violated his constitutional right to present his defense. Before us, the parties restrict their arguments to the question of the foundation or authentication of the actual writings depicted in the photographs.

*Standard of Review*

"'Whether . . . the authenticity of a writing is sufficiently established to render it admissible in evidence is a matter largely within the discretion of the trial court. [Citations omitted.]'" *State v. Hill*, 290 Kan. 339, 364, 228 P.3d 1027 (2010) (quoting *State v. Milum*, 202 Kan. 196, 198, 447 P.2d 801 [1968]). A district court abuses its discretion when: (1) no reasonable person would take the view adopted by the district court; (2) the ruling is based on an error of law; or (3) the exercise of discretion is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

*Analysis*

A trial court violates a criminal defendant's fundamental right to a fair trial if the court excludes relevant, admissible, and noncumulative evidence that is an integral part of the theory of the defense. The right to present a defense, however, is subject to statutory rules and judicial interpretation of the rules of evidence and procedure. *State v. Roeder*, 300 Kan. 901, 927, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015); see

*State v. Meeks*, 301 Kan. 114, 117, 339 P.3d 766 (2014). For instance, "'[t]he proponent of a particular kind of evidence, whether it be a physical object or the testimony of a witness, is required to lay a foundation before it may be admitted into evidence.'" *Wiles v. American Family Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015) (quoting 3 Barbara, Kansas Law and Practice, Lawyers Guide to Kansas Evidence, § 1.9, p. 28 [5th ed. 2013]). Foundation refers to "'preliminary questions designed to establish that evidence is admissible.' [Citations omitted.]" 302 Kan. at 74. Providing an adequate foundation prevents the finder of fact from being exposed to inadmissible evidence. 302 Kan. at 74.

Writings are subject to a specific, statutory foundational requirement. K.S.A. 60-464 provides: "Authentication of a writing is required before it may be received in evidence. Authentication may be by evidence sufficient to sustain a finding of its authenticity or by any other means provided by law." Proof of authenticity may be established not only by "'the genuineness of the writer's signature, or identity of the handwriting contained in the instrument, but also, under proper circumstances, by indirect or circumstantial evidence without resort to proof of handwriting. [Citations omitted.]'" *Hill*, 290 Kan. at 365 (quoting *Milum*, 202 Kan. at 197). Moreover, "[w]hen 'the contents themselves reveal knowledge peculiarly referable to a certain person or the contents are of such nature that the letter could not have passed between persons other than the purported writer and the person to whom it was delivered[,]' circumstantial evidence is sufficient." *Hill*, 290 Kan. at 365 (quoting *Milum*, 202 Kan. at 198).

Plainly stated, Banks made no effort to comply with the authentication requirements of K.S.A. 60-464. We have no evidence as to whose handwriting appears in the photographed writings. Further, nothing in the content of the writings gives a clue as to who might have authored them. The mere fact that they were found among papers

16

scattered in Flores' trunk is not persuasive, because the addresses and telephone numbers could have been written down by a third person and given to Flores or left in his car.

Consequently, we agree with the district court's assessment that, without knowing the author of the writings, that evidence is devoid of any relevance in this case and it would have served only to confuse the jury. The district court did not err in refusing to admit the unauthenticated writings.

Affirmed.